No. 21-5808

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

———————————

Robert Bledsoe,
*Plaintiff – Appellant,*

v.

Tennessee Valley Authority Board of Directors,
*Defendant – Appellee.*

**On Appeal from the United States District Court
for the Eastern District of Tennessee**

———————————————

**BRIEF OF APPELLANT
ROBERT BLEDSOE**

———————————————

Doug S. Hamill (BPR No. 022825)
620 Lindsay Street, Suite 200
Chattanooga, Tennessee 37403
(423) 541-5400

*Counsel for Appellant Robert Bledsoe*

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6 Cir. R. 26.1, Robert Bledsoe makes the following disclosures:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?
      No.

2.    Is there a publicly owned corporation, not a party to the appeal, that
      has a financial interest in the outcome?  No.


s/Doug S. Hamill                           9/14/21
Doug S. Hamill                             Date

# TABLE OF CONTENTS

Corporate Disclosure Statement …………………………………………….. i

Table of Contents …………………………………………………….…... ii

Table of Authorities ……………………………………………................... iv

Statement in Support of Oral Argument …………………………………….. viii

Statement of Jurisdiction …………….……………...……………………………… 1

Issues Presented for Review ………………………….…………………….………… 2

Statement of the Case …………………………………………………………… 3

    I.      Procedural History…………………………………………... 3

    II.     Background Facts…………………………………………… 4

    III.    Plaintiff's Disability……………………………………… 5

    IV.    Discriminatory Treatment ……………………………..……… 6

    V.     Bledsoe's Protected Activity……………………………….……… 11

    VI.    Ethics Issue……………………………………………………... 13

    VII.   Demotion and Removal from the SCT……………………….……… 16

Summary of Argument ………………………………………………….…… 17

Argument ……………………………………………………….…… 21

    I.      Standard of Review……………………………….................... 21

    II.     The District Court Incorrectly Determined that Bledsoe
              Failed to Present Direct Evidence of Discrimination…………..…… 21

III.    The District Court Incorrectly Dismissed Bledsoe's
        Disability and Age Discrimination Claims………………………….. 26

        A.    Applicable Standard…………………………………………….. 26

        B.    The Ethics Issue Did Not Actually Motivate
              the Demotion Decision…………………………………….…… 27

        C.    The Ethics Issue Did Not Warrant
              Bledsoe's Demotion…………………………………………….. 35

              1. Transferring Bledsoe to NLOR Instructor Position…..… 36

              2. Transferring Bledsoe's Son to Watts Bar's
                 NSGPO Class………………………………………….. 40

        D.    The Court Erred in Applying the Honest Belief Rule…….. 41

IV.     The District Court Incorrectly Dismissed
        Bledsoe's Retaliation Claims…………………………………… 48

V.      The "Solely By Reason of Disability" Standard Does
        Not Apply to Bledsoe's Rehabilitation Act Claim………….…… 50


Conclusion ……………………………………………………….......... 55

Certificate of Compliance ……………………………………………….. 56

Certificate of Service …………………………………………………… 57

Addendum ……………………………………………………………… 58

# TABLE OF AUTHORITIES

**Cases**

*A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*,
  711 F.3d 687 (6th Cir. 2013)....................................................................... 43

*Amos v. McNairy Cty.*, 622 F. App'x 529 (6th Cir. 2015)……………………… 44

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………………..… 21

*Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019)…….…. 26

*Babb v. Wilkie*, 140 S. Ct. 1168 (2020)…………………….……….………… 29

*Bennett v. City of Eastpointe*, 410 F.3d 810 (6th Cir. 2005)…………………….. 21

*Biddle v. Ruben*, 1995 WL 382961 (N.D. Ill. June 23, 1995)………………….... 53

*Braithwaite v. Dep't of Homeland Sec.*,
  473 F. App'x 405 (6th Cir. 2012)…………………………………………… 48

*Brewer v. New Era, Inc.*, 564 F. App'x 834 (6th Cir. 2014)…………………… 25

*Carroll v. Holder*, 2011 WL 7091804 (D. Or. 2011)……………………….... 52

*DeNoma v. Hamilton Cty. Ct. of Common Pleas*,
  626 F. App'x 101 (6th Cir. 2015)……………………………… 31, 32, 34, 35

*DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004)……………………….... 22, 25

*EEOC v. Rock-Tenn Co.*,
  2016 WL 6127844 (W.D. Mich. Feb. 3,  2016)………….………..... 43

*Evangelista v. Auto-Wares, LLC*,
  2016 WL 1407838 (E.D. Mich. Apr. 11, 2016)………….……..…….... 43

*Gribcheck v. Runyon*, 245 F.3d 547 (6th Cir. 2001)……………….………… 48

*Gutzwiller v. Fenik,* 860 F.2d 1317 (6th Cir. 1988)……………………..… 30

*Hannon v. Louisiana-Pac. Corp.*,
     784 F. App'x 444 (6th Cir. 2019)……………………………..…….…... 25

*Hamilton v. Gen. Elec. Co.*, 556 F.3d428 (6th Cir. 2009)……………………..... 29

*Harkness v. Bauhaus U.S.A., Inc.*,
     86 F.Supp.3d 544 (N.D. Miss. 2015)……………………….………..... 31

*Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*,
     176 F.3d 921 (6th Cir.1999)……………………….……………………..... 21

*Jones v. Potter*, 488 F.3d 397 (6th Cir. 2007)…………………..……………..... 53

*Joostberns v. United Parcel Servs., Inc.*,
     166 F. App'x 783 (6th Cir. 2006)……………………..…………….. 44, 45

*Katz v. Geithner*, 2013 WL 815999 (D. Haw. 2013)………………………….... 52

*Kline v. Tennessee Valley Auth.*, 128 F.3d 337 (6th Cir. 1997)……………..... 21

*Lewis v. Humboldt Acquisition Corp.*,
     681 F.3d 312 (6th Cir. 2012)……………………………………… 20, 50, 54

*Maddox v. Univ. of Tenn.,* 62 F.3d 843 (6th Cir. 1995)……………….……..... 53

*Maish v. Napolitano*,
     2013 WL 5770345 (W.D. Wash. Oct. 24, 2013)……………....……… 52

*Marshall v. The Rawlings Co. LLC*, 854 F.3d 368 (6th Cir. 2017)……...……… 45

*Matthews v. McDonald*, 2016 WL 29622, (S.D. Cal. Jan. 4, 2016)……...……... 52

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008)……...…….... 49

*Miles v. S. Cent. Hum. Res. Agency, Inc.*,
     946 F.3d 883, …………………….………………………..….…..…… 44

*Mitchell v. U.S. Postal Serv.*, F. App'x 838 (6th Cir. 2018)……………..…….... 53

v

*Murphy v. Ohio State Univ.*, 549 F. App'x 315 (6th Cir. 2013)…………..…… 43

*Pierce v. Gen. Motors LLC*, 716 F. App'x 515 (6th Cir. 2017)…………..…… 45

*Pinkerton v. Spellings*, 529 F.3d 513 (5th Cir. 2008)……………… 20, 51, 52, 53

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000)………..… 30, 31

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546 (6th Cir. 2008)…………..……… 42

*Seay v. Tenn. Valley Auth.*, 339 F.3d 454 (6th Cir. 2003)…………..…… 42, 43

*Seeger v. Cincinnati Bell Tel. Co., LLC,*
    681 F.3d 274 (6th Cir. 2012)………………………………………… 46

*Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555 (6th Cir. 2004)………… 49

*Stewart v. U.S.*, 2000 WL 1705657 (N.D. Cal. 2000)…………………..…… 53

*Thomas v. Department of Veterans Affairs,*
    2006 WL 1636738 (S.D.N.Y. 2006)…………………………………… 52

*Ward v. Vilsak*, 2011 WL 6026124 (E.D. Cal. 2011)…………………..…… 52

*Womanchild v. Nicholson*, 2008 WL 714091 (W.D. Wash. 2008)…..……… 52

*Wright v. Murray Guard, Inc.*, 455 F.3d 702 (6th Cir. 2006)…………..……… 46

*Wyatt v. Nissan N. Am., Inc.,*
    999 F.3d 400 (6th Cir. 2021)………………………….....…... 27, 44, 45

**Statutes**

28 U.S.C. § 1291…………………………………………………..………. 1

28 U.S.C. § 1331…………………………………………………..………. 1

29 U.S.C. § 633a…………………………………………………...…….... 1, 3

29 U.S.C. § 791……………………………………………….. 1, 2, 3, 20, 50

29 U.S.C. § 791(f)…………………………………………….. 20, 50

29 U.S.C. § 791(g)……………………………………….…………... 51

29 U.S.C. § 794(a)……………………………………….…………... 53

29 U.S.C. § 794a(1)-(2)…………………………………………... 52

29 U.S.C. §794……………………………………………… 2, 20, 50, 51

The Rehabilitation Act Amendments of 1992,
    Pub. L. No. 102-569……………………………….………… 51

Workforce Innovation and Opportunity Act 2014,
    Pub. L. No. 113-128……………………………….………… 51

## Rules

Fed. R. Civ. P. 56(a)……………………………………...……….. 21

Fed. R. App. P. 32(a)(7)(B)…………………………………...…... 56

Fed. R. App. P. 32(a)(7)(B)(iii)…………………………...………. 56

## Other Authority

Gardner, Jessica, *Reconciling Rehabilitation Act Claims*,
    8 LMU Law Rev. 110 (2021)……………………………...… 50

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Appellant Robert Bledsoe respectfully requests that the Court grant oral argument. In granting Appellee TVA Board of Directors' motion for summary judgment, the district court overlooked evidence establishing genuine issues of material fact, improperly viewed evidence in the light most favorable to the moving party, and failed to properly apply the applicable law to the facts of the case. Counsel will be able to assist the Court in identifying and addressing these issues and answering questions the Court may have at oral argument.

## STATEMENT OF JURISDICTION

This is an employment case brought under Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, and the Age Discrimination in Employment Act, 29 U.S.C. § 633a ("ADEA").  The district court had jurisdiction under 28 U.S.C. § 1331. Appellant Bledsoe appeals the district court's August 13, 2021, final judgment granting TVA's motion for summary judgment. (Judgment, RE 52, Page ID # 951).  Bledsoe filed a notice of appeal on August 20, 2021. (Notice of Appeal, RE 53, Page ID # 952).  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Whether the district court incorrectly granted TVA's motion for summary judgment and dismissed all of Bledsoe's claims.

2. Whether the district court erred in applying the honest belief rule in its summary judgment analysis.

3. Whether the district court erred in applying the sole-cause standard set forth in 29 U.S.C. §794 to Bledsoe's Rehabilitation Act claim brought under 29 U.S.C. §791.

# STATEMENT OF THE CASE

## I.     Procedural History

Bledsoe filed this employment case alleging disability discrimination under Section 501 of the Rehabilitation Act (29 U.S.C. § 791) and age discrimination under the Age Discrimination in Employment Act (29 U.S.C. § 633a), as well as retaliation under both Acts, in the district court on January 24, 2020. (Compl., RE 1, Page ID #: 1-10).  On March 30, 2020, TVA filed a Rule 12(b)(6) motion attacking the sufficiency of the pleadings, including whether Bledsoe properly alleged a disability.   (Mot. Dismiss, RE 8, Page ID #: 37-39.) The district court denied TVA's motion on September 3, 2020, after it was fully briefed by the parties. (Order Mot. Dismiss, RE 18, Page ID # 134-145; Resp. Mot. Dismiss, RE 11, Page ID # 78-96.)   On March 11, 2021, Bledsoe filed a motion for partial summary judgment on the issue of whether he could satisfy the "disability" element of his Rehabilitation Act discrimination claim.   (Mot. Part. SJ, RE 24, Page ID # 163-210.)  Thereafter, the parties entered a stipulation that Bledsoe had established his disability for purposes of his Rehabilitation Act discrimination claim.  (Stip., RE 27, Page ID # 229-230.)

On May 3, 2021, TVA filed a motion for summary judgment and supporting materials. (Mot. SJ, RE 30, Page ID # 235-765; Memo., RE 31, Page ID # 766-90; Stmt. Undisp. Facts, RE 32, Page ID # 791-98).  On May 11, 2021, Bledsoe filed a

3

response and supporting materials. (Resp., RE 33, Page ID # 799-836; Resp. Stmt. Undisp. Facts, RE 34, Page ID # 837-50; Stmt. Disp. Facts, RE 35, Page ID # 851-56). On May 11, 2021, TVA filed its reply. (Reply, RE 36, Page ID # 857-67).

On August 13, 2021, the district court entered a memorandum and order granting TVA's motion for summary judgment and dismissing all of Bledsoe's claims. (Memo. Opin., RE 51, Page ID # 936-50; Judgment, RE 52, Page ID # 951). Bledsoe timely filed a notice of appeal. (Notice App., RE 53, Page ID # 952-53).

## II.    Background Facts

Bledsoe has been employed by TVA since May 1985. (Bledsoe depo. pp. 48-49, RE 30-6, Page ID # 551.) For most of his TVA career, Bledsoe has been an Assistant Unit Operator (AUO) at the Sequoyah Nuclear Plant (SQN). (Id. at 50, RE 30-6, Page ID # 552.) In May 2015, Bledsoe was appointed by the Local Joint Training Subcommittee (LJTS) to serve as an instructor at the Sequoyah Training Center (STC). (Id. at 51, RE 30-6, Page ID # 552.) The LJTS is a plant-level committee that oversees the non-licensed training programs at the STC, including the NSGPO and NLOR programs. (Williams depo. pp. 20-21, RE 30-5, Page ID # 481-482.) The NSGPO program trains individuals to become AUOs. (Id. at 15-16, RE 30-5, Page ID # 476-477.) The NLOR program is TVA's annual training program for AUOs. (Id. at 17-18, RE 30-5, Page ID # 478-479.)

Bledsoe's main job duties as an instructor were to update and develop lesson plans, exams, and other training material for the NSGPO program. (Dahlman depo. p. 58, RE 30-1, Page ID # 254.) Additionally, Bledsoe assisted other instructors in the NLOR program, including periodic teaching duties. (Bailey depo. pp. 48, 78, RE 30-4, Page ID # 380, 410.) All instructors at the STC – whether in the non-licensed or licensed training programs – were encouraged to, and did, collaborate with each other. (Bailey depo. pp. 80-81, RE 30-4, Page ID # 412-413.) All instructors had access to every training program's exam banks. (Dahlman depo. p. 102, RE 30-1, Page ID # 265; Bledsoe depo. pp. 114, 135, RE 30-6, Page ID # 568, 573; Allen decl. ¶4, RE 33-2, Page ID # 825; Smith ¶11, RE 33-3, Page ID # 830.)

## III.   Plaintiff's Disability

In October 2016, Bledsoe began a medical leave of absence because of his damaged liver condition. (Bledsoe 1st decl. ¶3, 6, RE 24-1, Page ID # 165-166.) He had cirrhosis of the liver, which necessitated a liver transplant in December 2016. (Id.) Bledsoe returned to work full time in February 2017. (Bledsoe depo. p. 64, RE 30-6, Page ID # 555.) While Bledsoe was on leave, Chris Dahlman was promoted to the position of Operations Training Manager, which oversaw all training and instructors at the STC. (Dahlman depo. pp. 39-40, RE 30-1, Page ID # 249.) In Dahlman's previous position, he had no responsibilities over Bledsoe,

5

and he was not involved in Bledsoe's selection as instructor. (Id. at 46-47, 59, RE 30-1, Page ID # 251, 254.) Dahlman was the direct supervisor of Jeremy Bailey, who managed Bledsoe's daily assignments. (Dahlman depo. pp. 49, 58, RE 30-1, Page ID # 252, 254; Bailey depo. p. 35, RE 30-4, Page ID # 367.) When Bledsoe returned from his liver transplant surgery, his body was still in a weakened state. (Bledsoe depo. p. 65, RE 30-6, Page ID # 555.) He sometimes used a cane at work to walk. (Id. at 18, 67, RE 30-6, Page ID # 544, 556.) He also daily took several anti-rejection medications, which he kept at his work desk. (Id. at 15, 63, RE 30-6, Page ID # 543, 555.)

## IV.    Discriminatory Treatment Begins

Shortly after returning to work, Dahlman began to repeatedly question and criticize Bledsoe's health and age. (Id. at 158, RE 30-6, Page ID # 579.) From April 2017 through January 2018, Dahlman made many discriminatory comments about Bledsoe's disability and age. (Id. at 160-61, RE 30-6, Page ID # 579.) Examples include:

- Dahlman several times told Bledsoe that if he was not 100%, he could not use Bledsoe. (Id. at 15, 16, 31, RE 30-6, Page ID # 543, 547.)

- Dahlman questioned Bledsoe about his health condition. "Do you have other disabilities [in addition to the liver condition]? Tell me what they are." (Id. at 16, RE 30-6, Page ID # 543.)

- Dahlman told Bledsoe, "I need people 100% over here.  We're not running a rehabilitation clinic. . . . If you're not 100%, why haven't you filed for disability?"  (Id. at 16, RE 30-6, Page ID # 543.)

- Dahlman frequently targeted Bledsoe's age.  "Bo, how old are you? . . . Well, aren't you old enough to retire?"  (Id. at 16, RE 30-6, Page ID # 543.)  When Bledsoe stated that he had not considered retiring, Dahlman replied, "Well, maybe you should consider it."  (Id. at 16-17, RE 30-6, Page ID # 543.)

- Dahlman followed up several times about his suggestion for Bledsoe to retire.  For example, in May 2017, Dahlman again questioned Bledsoe if he had thought more about retiring or filing for disability.  (Id. at 17, RE 30-6, Page ID # 543.)  Dahlman then added that he was not "running a rehabilitation clinic for the sick and disabled.  We have too many people on restrictions and with medical problems here already."  (Id.)

- Dahlman and Bailey harassed Bledsoe about his use of a cane.  On several occasions, Jeremy Bailey informed Bledsoe that Dahlman did not like seeing instructors walking around with a cane, and that Dahlman had a problem with Bledsoe's cane.  (Id. at 17-18, RE 30-6, Page ID # 543-544.)  As a result, Bledsoe stopped using the cane and hid it behind a filing cabinet.  (Id. at 18, RE 30-6, Page ID # 544.)

7

- In the summer of 2017, Dahlman, when again asking about Bledsoe's disability, questioned Bledsoe about the medications on his desk, specifically asking how long he would be taking the medications and whether the medications would slow down the progress of preparations for the next NSGPO class.  (Id. at 19, RE 30-6, Page ID # 544.)

- Also in the summer of 2017, Dahlman applied more pressure upon Bledsoe to retire.  He asked Bledsoe if he had thought more about applying for disability.  Dahlman stated, "I don't think you're even working on [applying for disability]."  When Bledsoe again confirmed that he had no such plans, Dahlman replied, "I think you should.  I think if you talk to your doctor, he would probably tell you the same thing."  (Id. at 19, RE 30-6, Page ID # 544.)

- As time passed, Dahlman became blunt about Bledsoe retiring.  "Bo, you need to go ahead and retire.  I'm concerned about this disability you have, your condition with your liver."  (Id. at 21, RE 30-6, Page ID # 544.)

- Dahlman pestered Bledsoe about his medications to the point that Bledsoe removed them from his desk.  Dahlman stated to Bledsoe, "Do you have to leave those [medications] sitting out on your desk? . . . Just how disabled are you? . . . You'd better make a speedy recovery."  (Id. at 22-23, RE 30-6, Page ID # 545.)

8

- In October 2017, Dahlman told Bledsoe, "I think your disability is slowing all this [lesson planning] down.  You're really too old to be doing this."  (Id. at 24-25, RE 30-6, Page ID # 545.)   In the same conversation, Dahlman stated, "I am not patient.  I'm very vindictive.  If you piss me off, I'll have you over in that plant where it's 100 degrees in the summers, and you'll be trying to do things guys 20 years younger than you try to do.  Do you think you can do that?  I don't think that would be very good for that brand-new liver you just got."  (Id. at 25, RE 30-6, Page ID # 545.)

- In September or October 2017, Dahlman told Bledsoe that he and other managers, including Megan Markum from Human Resources, had been discussing Bledsoe.  Dahlman quipped, "If you have disabilities, you need to file for disability.  You don't need to continue to try to stay here. . . . I'm just tired of dealing with all your medical issues and disabilities. . . . Why don't you just go ahead and retire? . . . If it were me, I would go ahead and file for disability."  (Id. at 27-28, RE 30-6, Page ID # 546.)

- In November 2017, Dahlman asked Bledsoe if he was "cured yet."  When Bledsoe responded he was healing, Dahlman said, "That's not good enough.  I'm tired of disabilities and I'm tired of medical problems. . . . I don't want to deal with yours."  (Id. at 31, RE 30-6, Page ID # 547.)

9

- In December 2017, Jeremy Bailey told Bledsoe about his father passing up an opportunity to take early retirement, which ultimately had a negative consequence on his father's employment.  Upon finishing his story, Bailey stated, "The point being you need to go ahead and file for disability.  Your age, you're older.  Chris feels like it would be a good move for you.  You need to look into it." (Id. at 169-70, RE 30-6, Page ID # 581-582.)

- In January 2018, while discussing Bledsoe's progress in finishing up lesson plans for the NSGPO class, Dahlman stated, "Are you even going to be able to teach?  I wouldn't think with your medical condition and your age that you would want to teach." (Id. at 40-41, RE 30-6, Page ID # 549.)

Other TVA employees witnessed Dahlman make discriminatory comments. Jason Painter witnessed two such occasions.  On one occasion, Dahlman made a derogatory, mean-spirited comment about a retirement home bus coming to pick up Bledsoe.  (Painter decl. ¶6, RE 33-4, Page ID # 832.)  On a separate occasion, Dahlman, in a derogatory off-color jab at Bledsoe's age and health, suggested that Bledsoe needed a cane to walk.  (Id. ¶7, RE 33-4, Page ID # 832.)  Both comments were made in the fall of 2017.  (Id. ¶9, RE 33-4, Page ID # 832.)  Additionally, ILT instructor Dan Allen overheard Dahlman, while discussing whether to remove an individual whose age was in the mid-50s from the ILT program, state that the individual was "too old" for the program and that working as an operator "is a

young man's sport." (Allen decl. ¶7, RE 33-2, Page ID # 826.) Allen, who worked with Dahlman for five years at the STC, observed that Dahlman tended to target older workers and those who were physically weak or in bad health. (Id. ¶5-6, RE 33-2, Page ID # 826.) According to Allen, Dahlman liked people who looked young and healthy. (Id. ¶6, RE 33-2, Page ID # 826.)

Bledsoe did not immediately complain about Dahlman's discriminatory treatment because he was afraid of Dahlman. (Bledsoe depo. p. 159, RE 30-6, Page ID # 579.) Dahlman had repeatedly showed signs of physical intimidation toward Bledsoe, including getting into Bledsoe's face, raising his voice, and tensing and flexing his muscles. (Id. at 159-60, RE 30-6, Page ID # 579.) Not only did Bledsoe experience Dahlman's intimidation tactics, Bailey confirmed that Dahlman had a temper. (Id. at 157, RE 30-6, Page ID # 578.) Dahlman also reminded Bledsoe on several occasions that he was vindictive and that Bledsoe should never "piss [him] off." (Id. at 25, 26, 31, 39, RE 30-6, Page ID # 545-547, 549.)

## V.   Bledsoe's Protected Activity

In November 2017, Bledsoe did, however, make complaints against Dahlman. On or about November 27, 2017, Bledsoe had a meeting with Megan Markum, Jeremy Bailey, and David Williams. (Bledsoe depo. pp. 158-59, 163, RE 30-6, Page ID # 579-580.) Markum was an HR Generalist with responsibility over

11

all STC employees.  (Markum depo. p. 7, 11, 27, RE 30-11, Page ID # 616-617, 621.)  David Williams was the union vice president.  (Williams depo. pp. 12-13, RE 30-5, Page ID # 473-474 .)  Both Markum and Williams were also members of the LJTS.  (Markum depo. p. 28, RE 30-11, Page ID # 621; Williams depo. p. 28, RE 30-5, Page ID # 489.)   In the meeting with Markum, Bledsoe stated that Dahlman had been harassing him based on his disability and age, constantly berating him, encouraging him to retire, asking him about his age and disability, and badgering him about his medications. (Bledsoe depo. pp. 68, 163-64, RE 30-6, Page ID # 556, 580.)  Markum simply brushed off Bledsoe's complaints, indicating that she and Dahlman were personal friends and that she did not think that he had anything to worry about.  (Id. at 37, 164, RE 30-6, Page ID # 548, 580.)  Because Bledsoe believed that his complaints had fallen on deaf ears, he immediately relayed the same complaints of disability and age discrimination to Markum's supervisor, Jesi Shahan.  (Id. at pp. 37-38, 164, RE 30-6, Page ID # 548-549, 580.)  Shahan told Bledsoe that Markum would follow up on his complaints.  (Id. at 165-66, RE 30-6, Page ID # 580-581.)  Within a day or two, Bailey informed Bledsoe that he had shared Bledsoe's complaints with Dahlman, and that Dahlman was "pissed."  (Id. at pp. 38-39, 168-69, RE 30-6, Page ID # 549, 581.)  At some point in December 2017, Bailey informed Bledsoe that he had been talking with Dahlman and based on that conversation, Bailey stated, "I'm afraid Chris

[Dalhman] is going to try to get you out of here because he's really pissed off about you going and talking to HR."  (Id. at 169, RE 30-6, Page ID # 581.)

## VI.    Ethics Issue

On November 7, 2017, Bledsoe's son, Hudson, interviewed for a position in the NSGPO classes being offered at both Sequoyah Nuclear Plant (SQN) and Watts Bar Nuclear Plant (WBN).  (Dahlman depo. pp. 80-81, RE 30-1, Page ID # 259-260.)  LJTS members Chris Dahlman, Kevin Michael, and David Williams were all involved in Hudson's interview.  (Id. at pp. 79-80, 83-84, RE 30-1, Page ID # 259-260; Michael depo. p. 45, RE 30-16, Page ID # 690.)  By early November 2017, the LJTS expected that Bledsoe would be teaching the NSGPO class that would begin in March 2018.  (Id. at pp. 41-42, RE 30-16, Page ID # 689; Williams depo. p. 33, RE 30-5, Page ID # 494; Markum depo. p. 36, RE 30-11, Page ID # 623.)

Around the time of Hudson's interview, Bledsoe asked Dahlman and Bailey whether there would be any ethical problem for him to be an NSGPO instructor if his son was in the NSGPO class.  (Bledsoe depo. pp. 132-33, RE 30-6, Page ID # 572.)  Dahlman and Bailey indicated no concern.  (Id. at 133, RE 30-6, Page ID # 572.)  As an alternative, they told Bledsoe that he could be an instructor in the NLOR program while his son was in the NSGPO program.  (Id. at 134, RE 30-6, Page ID # 573.)  Shortly thereafter, Bledsoe had a similar conversation with

13

Michael, who indicated that if Dahlman did not have a problem with Bledsoe working in NLOR, he was not concerned about any ethical problems. (Id. at 134, RE 30-6, Page ID # 573.)

On November 20, 2017, Markum sent an email to TVA's ethics department asking whether it would violate ethical rules for Bledsoe to be an instructor in his son's NSGPO class. (Markum depo. pp. 37-38, RE 30-11, Page ID # 624; 11/21/2017 Email, RE 30-14.) TVA's ethics official responded that the scenario would be an ethical violation. (Id.) Markum did not initiate the ethics concern; rather, the concern was brought to her attention by Dahlman, Bailey, or Michael. (Markum depo. p. 38, RE 30-11, Page ID # 624.) According to Bailey, Dahlman "was heavily involved in a lot of the initial discussions" concerning this ethics issue. (Bailey depo. p. 85, RE 30-4, Page ID # 417.) Indeed, Dahlman first notified Bailey of the ethics issue. (Id.) Dahlman admitted that he was pleased about the ethics opinion because it was a "solution" to his desire to remove Bledsoe from the STC. (Dahlman depo. p. 123, RE 30-1, Page ID # 270; 11/21/2017 Email, RE 30-2.) By November 2017, Dahlman admitted that removing Bledsoe from the STC "was my wish at that time." (Dahlman depo. pp. 117-18, RE 30-1, Page ID # 269; Bailey depo. pp. 61-62, RE 30-4, Page ID # 393-394.) In fact, he had discussed his desire to remove Bledsoe with other LJTS

14

members around the time that the ethics issue was raised. (Dahlman depo. pp. 118, 123-24, RE 30-1, Page ID # 269-270.)

In response to the ethics opinion, the LJTS met on November 30, 2017, to discuss the ethics issue. (Markum depo. p. 55, RE 30-11, Page ID # 628.) The LJTS at the time was comprised of Chris Dahlman (training representative), Megan Markum (HR representative), David Williams (union representative), and Kevin Michael or Dennis Dimopoulos (management representative). (Resp. Stmt. Undisp. Facts No. 20, RE 34, Page ID # 841.) At the meeting, both Dahlman and Markum adamantly pushed for Bledsoe's complete removal from the STC. (Smith decl. ¶8, RE 33-3, Page ID # 829.) However, Williams proposed that Bledsoe be reassigned to the NLOR program to avoid any ethical problem. (Williams depo. pp. 33, 34-35, RE 30-5, Page ID # 494-496.) At the meeting, Michael was also in favor of Williams' proposal. (Smith decl. ¶8, RE 33-3, Page ID # 829.) No official vote was taken at the meeting. (Michael depo. p. 72, RE 30-16, Page ID # 697.) Rather, a prolonged discussion ensued thereafter over the next several weeks among the LJTS members. (Id. at p. 72, RE 30-16, Page ID # 697; Williams depo. p. 36, RE 30-5, Page ID # 497.) Williams continued to lobby against Bledsoe's removal and in favor of his reassignment to the NLOR program. (Id. at pp. 36, 44-45, RE 30-5, Page ID # 497, 505-506; Michael depo. p. 74, RE 30-16, Page ID # 697; Dahlman depo. pp. 90-91, RE 30-1, Page ID # 262.) In the meantime,

Bledsoe continued functioning as an NSGPO instructor through January 2018, finalizing lesson plans and exams and getting his instructor qualifications updated. (Bledsoe depo. pp. 136, 146, 154, RE 30-6, Page ID # 573, 576, 578.) Even as of February 2018, Bledsoe was under the impression that he would likely be reassigned to the NLOR program. (Id. at 156, RE 30-6, Page ID # 578.)

## VII.  Demotion and Removal from the SCT

Effective March 4, 2018, by unanimous vote of the LJTS, Bledsoe was removed from his instructor position at the STC. (2/27/18 Email, RE 33-5, Page ID # 833.) As a result, Bledsoe's annual salary was cut from $116,555 to $88,770. (Comp. Docs., RE 33-6, Page ID # 834-35.) At the time of his demotion, Bledsoe was age 58. (Bledsoe 2nd decl. ¶3, RE 33-1, Page ID # 824.)

## SUMMARY OF THE ARGUMENT

The district court dismissed Bledsoe's disability discrimination claim, age discrimination claim, and retaliation claims.  In its memorandum opinion granting summary judgment, the district court concluded that Bledsoe had failed to present any genuine issue of material fact as to whether TVA's proffered reason – an ethical conflict posed by Bledsoe's son being a student in a program in which Bledsoe was scheduled to teach – did not actually motivate or warrant the decision to demote Bledsoe from his instructor position.  (Memo. Opin., RE 51, Page ID # 947-48.)  In making this conclusion, the district court ignored or disregarded much of Bledsoe's evidence, and incorrectly viewed the evidence in a light most favorable to the moving party, TVA.

Bledsoe presented multiple discriminatory statements made by one of the key decision-makers, Chris Dahlman.  (Resp., RE 33, Page ID # 801-04.)  These statements clearly demonstrated Dahlman's bias against Bledsoe's disability and age, highlighted Dahlman's expressed belief that Bledsoe was too disabled and too old to continue his instructor role, and showed his desire for Bledsoe to retire because of his disability and age.  Despite the blatantly discriminatory comments, the district court erroneously concluded that "Dahlman's remarks that Bledsoe should retire because of his disability or age still requires an inference to reach the conclusion that LJTS actually demoted Bledsoe because of his disability or his

age." (Memo. Opin., RE 51, Page ID # 942-43.)  This determination was improper since Dahlman was one of four LJTS members who decided to demote Bledsoe. Moreover, the district court ignored Bledsoe's evidence that at least one other LJTS member, Megan Markum, admitted that she relied heavily on Dahlman's opinion in voting to demote Bledsoe.

The district court also erred in finding that Bledsoe had "not presented any evidence that Dahlman intended to cause the [demotion] action taken by the LJTS." (Memo. SJ, RE 51, Page ID # 946.)  In so holding, the district court ignored Dahlman's admissions that he desired to remove Bledsoe from his instructor role and that he had shared his desires with other LJTS members shortly prior to the LJTS's meeting to discuss Bledsoe's demotion.  Furthermore, while the district court acknowledged the cat's paw theory of liability, it further erred by claiming that Dahlman played no role in raising the ethics issue concerning Bledsoe. (Memo. Opin., RE 51, Page ID # 942, 945.)  To the contrary, Bledsoe presented evidence that created a question of fact as to whether Dahlman – not LJTS member Kevin Michael – initiated the ethics probe. (Resp., RE 33, Page ID # 818.)

The district court further erred in concluding that Bledsoe had failed to create a genuine issue of material fact as to whether the ethics issue was insufficient to warrant Bledsoe's demotion. (Memo. Opin., RE 51, Page ID # 947-

48.)  The LJTS was presented with two options to remedy the ethics concern while avoiding Bledsoe's demotion.  First, Bledsoe could have been transferred to the NLOR program, which was proposed by LJTS member David Williams and originally supported by LJTS member Kevin Michael.  Second, Bledsoe's son could have been transferred to another NSGPO class, which all LJTS members agreed would solve the issue.  Rather than viewing the evidence in a light most favorable to Bledsoe, the district court erred by applying the "honest belief" rule to its pretext analysis, claiming that, despite Bledsoe's evidence to the contrary, TVA made a "reasonably informed and considered decision" regarding Bledsoe's demotion.  (Memo. Opin., RE 51, Page ID # 948.)  Because TVA first raised the honest belief rule in its reply brief, Bledsoe had no opportunity to address the argument.  Moreover, the honest belief rule does not apply when a plaintiff (like Bledsoe in this case) demonstrates pretext by showing that the proffered reason either did not motivate, or was insufficient to warrant, the adverse action.

The district court erred in dismissing Bledsoe's retaliation claim based upon its belief that Bledsoe had failed to show a causal connection between his protected activity and demotion.  (Memo. Opin., RE 51, Page ID # 949.)  In so holding, the district court ignored Dahlman's retaliatory statement that he wanted to get rid of Bledsoe because of Bledsoe's complaint to HR, made at the time that the LJTS was discussing Bledsoe's demotion.  (Resp., RE 33, Page ID # 812.)

19

Finally, the district court erred in concluding that Bledsoe had to prove that his demotion was "solely because of [his] disability." (Memo. Opin., RE 51, fn. 3, Page ID # 943; RE 51, Page ID # 946.)  The causation language quoted by the district court applies to Rehabilitation Act claims brought under 29 U.S.C. § 794. In this case, Bledsoe's Rehabilitation Act claims are asserted under 29 U.S.C. § 791.  (Compl. ¶30-32, RE 1; Page ID # 7-8.)  Claims brought under 29 U.S.C. § 791 apply the same standards that apply to Title I of the ADA.  29 U.S.C. § 791(f). The causation standard for claims brought under Title I of the ADA is "but-for" causation.  *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012).  The only circuit court to address this issue concluded that the sole causation standard does not apply to a claim asserted under 29 U.S.C. § 791. *Pinkerton v. Spellings*, 529 F.3d 513 (5th Cir. 2008).

# ARGUMENT

## I.    Standard of Review

The Court reviews a district court's grant of summary judgment *de novo*. Summary judgment is appropriate only when there is no genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  In reviewing a summary judgment motion, the facts and any inferences that can be drawn from those facts must be viewed in the light most favorable to the non-moving party.  *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005).  The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## II.    The District Court Incorrectly Determined that Bledsoe Failed to Present Direct Evidence of Discrimination

A plaintiff may establish a claim of discrimination by either direct or circumstantial evidence.  *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).  "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999). "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the

21

challenged employment action was motivated at least in part by prejudice against members of the protected group." *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004). When direct evidence is presented, the plaintiff does not bear the burden of disproving other possible nondiscriminatory reasons proffered by the defendant. Rather, the burden shifts to the defendant to provide that it would have made the same decision absent a discriminatory motive. *Id*.

In this case, LJTS member Chris Dahlman made numerous comments expressing his belief that Bledsoe was either too disabled or too old to perform the instructor position and that he wanted Bledsoe to retire because of his age and disability. The most blatantly discriminatory comments include:

- In the summer of 2017, Dahlman asked Plaintiff if he had thought more about applying for disability. Dahlman stated, "I don't think you're even working on [applying for disability]." When Plaintiff again confirmed that he had no such plans, Dahlman replied, "I think you should. I think if you talk to your doctor, he would probably tell you the same thing." (Bledsoe depo. p. 19, RE 30-6, Page ID # 544.)

- Dahlman told Bledsoe, "Bo, you need to go ahead and retire. I'm concerned about this disability you have, your condition with your liver." (Id. at 21, RE 30-6, Page ID # 544.)

- In October 2017, Dahlman told Bledsoe, "I think your disability is slowing all this [lesson planning] down. You're really too old to be doing this." (Id. at 24-25, RE 30-6, Page ID # 545.) In the same conversation, Dahlman stated, "I am not patient. I'm very vindictive. If you piss me off, I'll have you over in that plant where it's 100 degrees in the summers, and you'll be trying to do things guys 20 years younger than you try to do. Do you think you can do that? I don't think that would be very good for that brand-new liver you just got." (Id. at 25, RE 30-6, Page ID # 545.)

- In September or October 2017, Dahlman stated to Bledsoe, "If you have disabilities, you need to file for disability. You don't need to continue to try to stay here. . . . I'm just tired of dealing with all your medical issues and disabilities. . . . Why don't you just go ahead and retire? . . . If it were me, I would go ahead and file for disability." (Id. at 27-28, RE 30-6, Page ID # 546.)

- In November 2017, Dahlman asked Bledsoe if he was "cured yet." When Bledsoe responded he was healing, Dahlman said, "That's not good enough. I'm tired of disabilities and I'm tired of medical problems. . . . I don't want to deal with yours." (Id. at 31, RE 30-6, Page ID # 547.)

- In January 2018, while discussing Bledsoe's progress in finishing up lesson plans for the NSGPO class which was about to begin, Dahlman stated, "Are

you even going to be able to teach?  I wouldn't think with your medical condition and your age that you would want to teach."  (Id. at 40-41, RE 30-6, Page ID # 549.)

Bledsoe's supervisor, Jeremey Bailey, relayed several discriminatory comments from Dahlman to Bledsoe about his disability and age.  Several times Bailey informed Bledsoe that Dahlman did not like seeing instructors walking around with a cane, and that Dahlman had a problem with Bledsoe's cane.  (Id. at pp. 17-18, RE 30-6, Page ID # 543-544.)  In December 2017, Bailey recounted a story about his father passing up an opportunity to take early retirement, which ultimately had a negative consequence.  Upon finishing his story, Bailey stated to Bledsoe, "The point being you need to go ahead and file for disability.  Your age, you're older.  Chris [Dahlman] feels like it would be a good move for you.  You need to look into it."  (Id. at 169-70, RE 30-6, Page ID # 581-582.)

As one of four LJTS members who voted to demote Bledsoe, Dahlman was clearly a decisionmaker.  Bailey also influenced the LJTS's decision to demote Bledsoe.  LJTS member Megan Markum admitted that she "relied heavily" on the opinions of Dahlman and Bailey in determining that no reasonable alternatives could be made for Bledsoe to avoid any ethical problems.  (Markum depo. p. 42, RE 30-11, Page ID # 625.)  Dahlman and Bailey also convinced Markum not to pose any further questions to TVA's ethics department, including whether

24

transferring Bledsoe to NLOR instructor would cure the ethics issue. (Id. at 42-43, 45-46, RE 30-11, Page ID # 625-626.)

The aforementioned comments made by Dahlman – a decisionmaker who influenced other decisionmakers – constitute direct evidence of discrimination, particularly when such comments were made within two or three months of Bledsoe's demotion. *See Dicarlo*, 358 F.3d at 417 (racially derogatory comments made by decisionmaker within three weeks of termination constitute direct evidence of discrimination); *Brewer v. New Era, Inc.*, 564 F. App'x 834, 839 (6th Cir. 2014) (comments made by decisionmaker that plaintiffs were "too old" and "needed to retire" two months before plaintiffs were laid off constituted direct evidence of discrimination); *Hannon v. Louisiana-Pac. Corp.*, 784 F. App'x 444, 448–49 (6th Cir. 2019) (ageist statements made by decisionmaker within a few months of adverse employment action constitute direct evidence of discrimination).

The district court found that "Dahlman's remarks that Bledsoe should retire because of his disability and age still requires an inference to reach the conclusion that [the] LJTS actually demoted Bledsoe because of his disability and age." (Memo. Opin., RE 51, Page ID # 942-43.) Dahlman's comments clearly demonstrate that he voted to demote Bledsoe because of his disability and age. If

25

Dahlman's comments do not constitute direct evidence, it is hard to imagine what would.

## III. The District Court Incorrectly Dismissed Bledsoe's Disability and Age Discrimination Claims

### A. Applicable Standard

Even assuming Dahlman's comments do not constitute direct evidence of discrimination, Bledsoe presented sufficient evidence to establish a genuine issue of material fact as to whether TVA's proffered reason was pretextual. In this case, TVA did not challenge Bledsoe's ability to establish a *prima facie* case of disability and age discrimination. (TVA SJ Memo., RE 31, Page ID # 782) ("Assuming arguendo that Mr. Bledsoe can establish a prima facie case for disability discrimination, age discrimination, and retaliation . . ."). Rather, TVA solely challenged Bledsoe's ability to establish pretext. (Id.) Thus, at the summary judgment stage, the appropriate focus is whether Bledsoe has presented evidence sufficient to create a genuine issue as to whether TVA's proffered reason for demoting him is pretextual. *See Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019) (to survive summary judgment an employee does not have to prove pretext but only needs to "create a *genuine issue* as to whether the rationale is pretextual").

Pretext may be demonstrated by showing that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse action; or (3) was

insufficient to warrant the adverse action. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 421 (6th Cir. 2021). In this case, Bledsoe utilizes the second and third pretext methods – that the ethics issue did not actually motivate the demotion decision and that the ethics issue did not warrant Bledsoe's demotion. (Resp. Mot. SJ, RE 33, Page ID # 813.)

### B.  The Ethics Issue Did Not Actually Motivate the Demotion Decision

Bledsoe has presented sufficient evidence of discriminatory animus to raise a genuine issue of material fact as to whether the ethics reason actually motivated the decision to demote Bledsoe from his instructor role.

Dahlman clearly harbored discriminatory animus against Bledsoe based upon his disability and age. He believed that Bledsoe was too disabled and too old to be an instructor. For instance, Dahlman bluntly stated, "I think your disability is slowing all this [lesson planning] down. You're really too old to be doing this." (Bledsoe depo. pp. 24-25, RE 30-6, Page ID # 545.) Dahlman questioned, "Are you even going to be able to teach? I wouldn't think with your medical condition and your age that you would want to teach." (Id. at 40-41, RE 30-6, Page ID # 549.) Both Dahlman and Bailey strongly urged Bledsoe to retire due to his disability and age. For example, Dahlman stated, "Bo, you need to go ahead and retire. I'm concerned about this disability you have, your condition with your liver." (Id. at 21, RE 30-6, Page ID # 544.) In December 2017 – while the LJTS

was considering Bledsoe's removal – Bailey told Bledsoe, "The point being you need to go ahead and file for disability. Your age, you're older. Chris [Dahlman] feels like it would be a good move for you. You need to look into it." (Id. at 169-70, RE 30-6, Page ID # 581-582.)

Dahlman also implicated LJTS member Megan Markum in this discriminatory animus toward Bledsoe. In September or October 2017, Dahlman told Bledsoe that he **and other managers, including Megan Markum in HR**, "have sat down and discussed this. If you have disabilities, you need to file for disability. You don't need to continue to try to stay here. . . . I'm just tired of dealing with all your medical issues and disabilities. . . . Why don't you just go ahead and retire? . . . If it were me, I would go ahead and file for disability." (Id. at 27-28, RE 30-6, Page ID # 546.) Based on this statement, a jury could reasonably conclude that both Dahlman and Markum desired Bledsoe to retire because of his disability or age.

By November 2017, Dahlman admitted that removing Bledsoe from the STC "was my wish at that time." (Dahlman depo. pp. 117-18, RE 30-1, Page ID # 269; Bailey depo. pp. 61-62, RE 30-4, Page ID # 393-394.) In fact, Dahlman had discussed his desire to remove Bledsoe with other LJTS members around the time that the ethics issue was raised. (Dahlman depo. pp. 118, 123-24, RE 30-1, Page ID # 269-270.) Tellingly, Dahlman admitted that he was pleased about the ethics

opinion because it was a "solution" to his desire to remove Bledsoe from the STC. (Id. at p. 123, RE 30-1, Page ID # 270; 11/21/2017 Email, RE 30-2, Page ID # 296-299.)   A jury could reasonably conclude that Dahlman's disability and age bias motivated him to lobby the LJTS for Bledsoe's demotion, particularly when he had an ally in Markum.  Dahlman simply seized upon the ethics issue to cover up his longstanding illegal motive.  *See Hamilton v. Gen. Elec. Co*., 556 F.3d 428, 436 (6th Cir. 2009) ("We have held that when an employer…waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee, the employer's actions constitute the very definition of pretext.").

TVA cannot escape liability merely by claiming that the decision to demote Bledsoe was a group decision.  In the context of group decision-making, one member can greatly influence the outcome.  If an influential decisionmaker is motivated by discrimination, then the entire decision is tainted.  Under the ADEA, the challenged personnel action must be made "free from" or "untainted" by age discrimination.  *Babb v. Wilkie*, 140 S. Ct. 1168, 1173 (2020).   "If age discrimination plays any part in the way a decision is made, then the decision is not made in a way that is untainted by such discrimination."  *Id*. at 1174.

In this case, the jury may reasonably determine that the actions of one or more biased individuals on a committee can influence other non-biased members

so that the ultimate decision is impermissibly tainted by discrimination. The case of *Gutzwiller v. Fenik,* 860 F.2d 1317 (6th Cir. 1988) demonstrates this point. In *Gutzwiller*, the Sixth Circuit affirmed a jury's determination that two individuals' sex bias influenced the decision of a committee and two other university officials to not recommend tenure to a professor. On appeal, the two individuals (Fenik and Cohen) found to have harbored sex-bias argued that any discriminatory intent could not have been the "but for" cause of the tenure denial. The Sixth Circuit rejected this argument, reasoning:

> In our view, there was sufficient evidence from which the jury could find that the discriminatory intent of Fenik and Cohen was more likely than not the basis for Gutzwiller's denial of tenure. In particular, the evidence showed that most of the members of the [tenure committee], by their own admission, lacked the expertise to properly judge Gutzwiller's work and, therefore, relied exclusively upon the opinion of Fenik, the Committee chairman. Indeed, the majority of the Committee members had not even read any significant part of Gutzwiller's publications. There was also evidence that both Fenik and Cohen—the most powerful members of the Department—told at least one member of the RPTC prior to deliberations that they intended to vote against tenure for Gutzwiller…. The jury reasonably could have found that the actions of Fenik and Cohen influenced the other members of the Committee to vote against Gutzwiller *and* resulted in Provost Steger's negative tenure recommendation.

*Gutzwiller*, 860 F.2d at 1327.

The principle that the discriminatory motive of even a single decisionmaker can impermissibly taint a group employment decision was found in the case of *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000). In *Reeves*, the

evidence suggested that one decisionmaker out of the group of decisionmakers harbored age bias against the plaintiff. *Id*. at 152. The Court noted that the appellate court erred by requiring evidence of age bias of the other decisionmakers; the age bias of one decisionmaker was enough to affirm the jury's finding of intentional discrimination in the entire decision-making process. *Id*. at 152-53.

The animus of one decision-maker may be imputed to other decision-makers under the "cat's paw" theory of liability. *Harkness v. Bauhaus U.S.A., Inc.*, 86 F.Supp.3d 544, 558 (N.D. Miss. 2015). Cat's paw liability was applied to a group decision in the case of *DeNoma v. Hamilton Cty. Ct. of Common Pleas*, 626 F. App'x 101 (6th Cir. 2015). In *DeNoma*, the plaintiff alleged that she was denied promotion based upon sex and retaliation. The evidence showed that the highest-ranking employee (Walton) harbored a sex bias against females, including plaintiff. While the biased employee was not actually a voting member of the promotion committee, the Sixth Circuit applied the cat's paw liability theory to impute liability to the committee's decision. In so doing, the Sixth Circuit reasoned:

> Finally, a reasonable jury could find that Walton's communications with Ventre were a proximate cause of the rejection of Appellant's application. In affidavits, the three committee members all denied that they considered Walton's preferences when making their recommendation. However, a reasonable jury could reject that testimony. "[A] biased employee's 'position [of] influence' is probative of that employee's ability to influence the ultimate decisionmaker." *Chattman,* 686 F.3d at 353 (second alteration in

31

original) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 355 (6th Cir.1998)). Here, Walton was the committee members' superior. Moreover, there is evidence that the committee members were close to Walton professionally. A reasonable jury could thus find that Ventre opposed Appellant's selection by the committee as a matter of course because Walton had criticized her job performance and omitted her when discussing good candidates for the position. This conclusion would render Walton's act a proximate cause of the rejection of Appellant's application, even if not the sole cause.

*DeNoma*, 626 F. App'x at 107–08.

In this case, Dahlman and Bailey exerted substantial influence over the LJTS's decision-making process. Markum "relied heavily" on the opinions of Dahlman and Bailey in determining that no reasonable alternatives could be made for Bledsoe to avoid any ethical problems. (Markum depo. p. 42, RE 30-11, Page ID # 625.) Dahlman and Bailey convinced Markum not to pose any further questions to TVA's ethics department, including whether transferring Bledsoe to NLOR instructor would cure the ethics issue. (Id. at 42-43, 45-46, RE 30-11, Page ID # 625-626.) Markum further admitted that she never sought an opinion on this issue from LJTS member Kevin Michael, because "he isn't over the training center." (Id. at 46, RE 30-11, Page ID # 626.) Even Michael admitted that Dahlman and Bailey had more knowledge of the STC than he did. (Michael depo. pp. 60-61, RE 30-16, Page ID # 694.) Thus, Dahlman – as Training Center Manager – played a pivotal role in the decision-making process because of his knowledge about the instructor's duties.

32

Additionally, Dahlman and Markum were close personal friends. When Markum dismissed Bledsoe's complaints of discrimination, she stated, "I know Chris [Dahlman] personally . . . we're friends and I've had a lot of interaction with him." (Bledsoe depo. p. 37, RE 30-6, Page ID # 548.) This personal friendship allowed Dahlman to exercise great influence over Markum. His influence over Markum was readily apparent at the LJTS meeting where David Smith observed that both Dahlman and Markum were "adamant" in pushing for Bledsoe's removal, even when Williams and Michael were in favor of transferring Bledsoe to NLOR. (Smith decl. ¶8, RE 33-3, Page ID # 829.)

The district court erroneously stated that "Dahlman had no role in bringing the ethics concern to TVA's Director of Ethics and Compliance." (Memo. SJ, RE 51, Page ID # 942.) A jury could reasonably conclude that Dahlman – not Michael – originated the ethics concern as a convenient method of removing Bledsoe from the STC. First, while Michael claims he instructed Markum to seek an ethics opinion, Markum recalled that she was advised to do so by either Dahlman, Bailey, or Michael. (Markum depo. p. 38, RE 30-11, Page ID # 624.) Second, Bailey admitted that Dahlman "was heavily involved in a lot of the initial discussions" concerning the ethics issue. (Bailey depo. p. 85, RE 30-4, Page ID # 417.) Moreover, it was Dahlman who first notified Bailey of the ethics issue. (Id.) Third, Dahlman admitted that he was pleased about the ethics ruling because it was

33

a "solution" to his desire to remove Plaintiff from the STC.  (Dahlman depo. p. 123, RE 30-1, Page ID # 270; 11/21/2017 Email, RE 30-2, Page ID # 296-299.) Fourth, Michael's testimony that he initiated the ethics concern and that he was never in favor of transferring Plaintiff to NLOR (Michael depo. pp. 54, 73, RE 30-16, Page ID # 692, 697) is contradicted by testimony that Michael expressed no ethical concerns to Bledsoe about his son being in the NSGPO class (Bledsoe depo. p. 134, RE 30-6, Page ID # 573) and Michael's initial approval at the LJTS meeting of Williams' suggestion for Plaintiff to be transferred to NLOR to resolve the ethics concern (Smith decl. ¶8, RE 33-3, Page ID # 829).  Viewing the evidence in a light most favorable to Bledsoe, a jury could reasonably disbelieve Michael's testimony and conclude that Dahlman raised the ethics issue as a convenient solution to remove Bledsoe.

To the extent that the other LJTS members deny Dahlman's influence in the group decision-making process, at the summary judgment stage, the law recognizes that a reasonable jury could reject such testimony.  The Sixth Circuit recognized that exact point in *DeNoma v. Hamilton Cty. Ct. of Common Pleas*, 626 F. App'x 101 (6th Cir. 2015).  There, in an attempt to downplay the influence of a biased manager [Walton], the defendant submitted affidavits of the group decisionmakers.  "In affidavits, the three committee members all denied that they

considered Walton's preferences when making their recommendation. However, a reasonable jury could reject that testimony." *DeNoma*, 626 F.App'x at 107.

Surprisingly, the district court claimed that "Bledsoe has not presented any evidence that Dahlman intended to cause the action taken by the LJTS." (Memo. Opin., RE 51, Page ID # 946.)  The district court's statement is true only if the foregoing evidence submitted by Bledsoe is ignored and the evidence is viewed in a light most favorable to the moving party, TVA.  However, viewing the evidence submitted by Bledsoe in a light most favorable to him, a genuine issue of material fact exists as to whether the ethics reason actually motivated the decision to demote Bledsoe.

### C.    The Ethics Issue Did Not Warrant Bledsoe's Demotion

While Bledsoe could not ethically serve as NSGPO instructor while his son was in the same NSGPO class, the LJTS was not required to remove Bledsoe from being an instructor at the STC.  It faced two viable options of retaining Bledsoe as an instructor while avoiding an ethical conflict.  First, Bledsoe could have been transferred to an instructor position in the NLOR program.  Second, Bledsoe's son could have been transferred to Watts Bar's NSGPO class.

TVA's argument that the LJTS was solely confined to keeping or removing Bledsoe as an NSGPO instructor (Reply, RE 36, Page ID#: 859) is wholly without merit.  Indeed, the LJTS spent time considering the option of transferring Bledsoe

to the NLOR program. Williams made such proposal in the LJTS meeting, and Michael initially voiced his favor of this proposal. (Williams depo. pp. 33-35, RE 30-5, Page ID # 494-496; Smith decl. ¶8, RE 33-3, Page ID # 829.) A prolonged discussion ensued thereafter for several weeks among the LJTS members regarding this proposal. (Michael depo. p. 72, RE 30-16, Page ID # 697; Williams depo. p. 36, RE 30-5, Page ID # 497.) Thus, there is certainly no evidence that the LJTS somehow lacked authority to transfer Bledsoe to another instructor role.

1. Transferring Bledsoe to NLOR Instructor Position

Based on testimony submitted by Bledsoe, a jury could reasonably conclude that transferring Bledsoe to the role of NLOR instructor would have eliminated any ethics concern. (Williams depo. pp. 34-35, RE 30-5, Page ID # 495-496; Smith decl. ¶9, RE 33-3, Page ID # 829; Allen decl. ¶8, RE 33-2, Page ID # 826.) The opinions of David Smith and Daniel Allen are important because of their experience as instructors in the NLOR and NSGPO programs (Smith decl. ¶3, 5, RE 33-3, Page ID # 828) and the ILT and LOR programs (Allen decl. ¶3, RE 33-2, Page ID # 825). David Williams was very familiar with the non-licensed training programs, and he had served as an LJTS member over ten years. (Williams depo. p. 28, RE 30-5, Page ID # 489.) As an added security measure, the NSGPO exam bank could have easily been password protected to alleviate any possible appearance of an ethical concern. (Dahlman depo. pp. 93-94, RE 30-1, Page ID #

36

263; Michael depo. pp. 65-66, RE 30-16, Page ID # 695; Smith decl. ¶9, RE 33-3, Page ID # 829; Allen decl. ¶8, RE 33-2, Page ID # 826.)  Moreover, when Bledsoe first raised the potential ethics issue to Dahlman and Bailey, both mentioned that he could serve as NLOR instructor without any ethical problems.  (Bledsoe depo. pp. 133-34, RE 30-6, Page ID # 572-573.)  At the LJTS meeting, Michael was in favor of transferring Plaintiff to the role of NLOR instructor to solve the ethics issue.  (Smith decl. ¶8, RE 33-3, Page ID # 829.)

Additional evidence belies TVA's claim that transferring Bledsoe to NLOR would still violate ethics rules.  First, TVA had no ethics opinion – nor did it attempt to seek an ethics opinion – specifically regarding the proposal to transfer Bledsoe to NLOR.  (Markum depo. pp. 44-45, RE 30-11, Page ID # 625-626.) Markum admitted she had no independent opinion on whether the proposal to transfer Bledsoe to NLOR would solve any ethical concern.  (Id. at 43-44, RE 30-11, Page ID # 625.)  Second, the LJTS members did not consider themselves experts in the field of ethics.  (Id. at pp. 46-47, RE 30-11, Page ID # 626; Dahlman depo. p. 135, RE 30-1, Page ID # 273.)  At the summary judgment stage, a court cannot weigh the competing testimony as to whether transferring Bledsoe to NLOR would still run afoul of federal ethics rules, particularly in the absence of an ethics opinion on-point.

37

TVA also argued against transferring Bledsoe to NLOR because of staffing concerns in situations where NLOR instructors might have to cover when NSGPO instructors were unavailable.  This "staffing flexibility" argument, however, is a red herring.  In both the past, and during the entire 18-month NSGO class that began in March 2018, NLOR instructors were <u>never</u> used as substitutes for NSGPO instructors.  (Smith decl. ¶10, RE 33-3, Page ID # 829-830; Williams depo. pp. 35-36, RE 30-5, Page ID # 496-497; Allen decl. ¶8, RE 33-2, Page ID # 826.)  As LJTS member Williams noted, TVA's "staffing flexibility" argument was based upon a hypothetical that had never happened in the past – and did not happen for the 2018 NSGPO class of which Bledsoe's son was a student. (Williams depo. p. 35, RE 30-5, Page ID # 496.)

TVA further argued against transferring Bledsoe to NLOR because he still might have access to his son's NSGPO exams.  It is true that all instructors at the STC have access to all program exams.  (Allen decl. ¶4, RE 33-2, Page ID # 825; Smith decl. ¶11, RE 33-3, Page ID # 830.)  For example, an ILT instructor can access NSGPO exams and an NLOR instructor can access ILT exams.  (Id.)  A jury could reasonably conclude that this reasoning was merely a rouse.  At the time that the LJTS was considering whether to transfer Bledsoe, two other STC instructors had sons entering the training programs as students.  NLOR instructor Darrell Johnson's son was entering the ILT program, and ILT instructor Bernie

Geier's son was entering the NSGPO program.  (Allen decl. ¶8, RE 33-2, Page ID # 826; Smith decl. ¶12, RE 33-3, Page ID # 830; Markum depo. pp. 50-52, RE 30-11, Page ID # 627.)  If moving Bledsoe to NLOR would not have solved the ethics issue (as TVA claims), then the same ethics rationale should have excluded Johnson and Geier from serving as instructors while their sons were participating in training programs, since they too would have had the same access to their sons' test banks.  (Allen decl. ¶8, RE 33-2, Page ID # 826; Smith decl. ¶12, RE 33-3, Page ID # 830.)

The district court attempted to construct an "imaginary wall" separating the non-licensed (NSGPO and NLOR) and licensed (ILT and LOR) training programs, thus distinguishing Johnson and Geier's scenario from Bledsoe's scenario.  (See Memo. Opin., RE 51, Page ID#: 947 – "NSGPO and NLOR courses were too intertwined").  However, Bledsoe produced evidence of there being no "imaginary wall" separating the non-licensed and licensed training programs.  (Allen decl. ¶4, RE 33-2, Page ID # 825; Smith decl. ¶11, RE 33-3, Page ID # 830.)  Moreover, the credibility of TVA's argument is called into question by the testimony of Williams, who stated:

> I have doubts about the Subcommittee's explanation why Robert Bledsoe could not teach Requalification [NLOR] while his son was in NSGPO.  Requalification instructors would not see the NSGPO exam before the students took it.  Many people in the Training Center can access the exam bank, but they nonetheless hired an instructor for the initial licensing program [ILT] whose son was in NSGPO.  I suspect

that management simply did not want Robert Bledsoe at the Training Center anymore.

(Williams EEO decl. ¶6-7, RE 33-7, Page ID # 836)

Importantly, TVA never bothered to seek an ethics opinion as to Johnson and Geier.  (Markum depo. pp. 50, 52, RE 30-11, Page ID # 627.)  When pressed, Bailey confessed that there were enough ethical concerns to justify an ethics inquiry regarding Johnson and Geier and their sons participating in the training programs.  (Bailey depo. pp. 90-91, RE 30-4, Page ID # 422-423.)  The same ethics rules applied to Bledsoe, Johnson, and Geier.  Thus, a jury could reasonably conclude that TVA treated him more harshly than similarly-situated instructors Johnson and Geier.  Selectively applying the ethics rules to Bledsoe – but not to similarly-situated instructors – is evidence of pretext.

### 2.  Transferring Bledsoe's Son to Watts Bar's NSGPO Class

A genuine issue of fact exists as to whether the LJTS could have transferred Bledsoe's son to the NSGPO class at Watts Bar rather than demote Bledsoe. During the ethics debate, Bledsoe suggested that his son would be willing to go to the NSGPO class at Watts Bar if that would clear up any ethics concerns. (Williams depo. p. 66, RE 30-5, Page ID # 527; Bledsoe depo. pp. 152-55, RE 30-6, Page ID # 577-578.)  Bledsoe's son himself was agreeable and willing to work at Watts Bar.  (H. Bledsoe Decl., RE 30-18, Page ID # 724.)  Indeed, Dahlman and Michael admitted that they were aware that Hudson Bledsoe was willing to work at

both Sequoyah and Watts Bar nuclear plants. (Dahlman depo. p. 82, RE 30-1, Page ID # 260; Michael depo. pp. 48, 50, RE 30-16, Page ID # 691.) All LJTS members agreed that this solution would have solved any ethics concern. (Markum depo. pp. 64-65, RE 30-11, Page ID # 630-631; Dahlman depo. pp. 116-17, RE 30-1, Page ID # 268-269; Michael depo. pp. 78-79, RE 30-16, Page ID # 698-699; Williams depo. p. 38, RE 30-5, Page ID # 499.)

Contrary to the district court's belief, the list of NSGPO students was not already set when the LJTS considered Bledsoe's ethics issue. (Memo. Opin., RE 51, Page ID # 948 – "the list of upcoming students and their locations had already been set".) By late November 2017 when the LJTS was discussing the ethics issue, the list of NSGPO students at both Sequoyah and Watts Bar had **not** been finalized. (Dahlman depo. pp. 108, 110, 116, RE 30-1, Page ID # 266-268; Michael depo. pp. 75-76, 78, RE 30-16, Page ID # 698.) In fact, in December 2017, students were transferred between the NSGPO classes at both nuclear plants. (Id.) Viewing the evidence in a light most favorable to Bledsoe, a jury could reasonably conclude that the LJTS could have transferred Bledsoe's son to Watts Bar's NSGPO class, thus obviating the need to demote Bledsoe.

### D.   The Court Erred in Applying the Honest Belief Rule

In granting summary judgment, the district court applied the "honest belief" rule, concluding that the LJTS "made a reasonably informed" decision in rejecting

41

the proposal to transfer Bledsoe to the NLOR program.  (Memo. Opin., RE 51, Page ID # 947-48.)  For multiple reasons, the honest belief rule does not afford TVA protection from liability in this case.

First, TVA did not mention the honest belief rule in its motion for summary judgment, but raised it for the first time in its reply to Bledsoe's summary judgment response.  (TVA Memo., RE 31, Page ID # 781-89; Def. Reply, RE 36, Page ID # 862-63, 865.)  Because TVA first raised the honest belief rule in its reply, Bledsoe was not afforded an opportunity to respond.  "Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.  Further the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (quoting *Novosteel SA v. United States,* 284 F.3d 1261, 1274 (Fed. Cir. 2002)).  By failing to give Bledsoe a reasonable opportunity to respond to TVA's honest belief argument, the district court abused its discretion in considering the issue. *See Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481–82 (6th Cir. 2003) (finding that the district court abused its discretion in granting summary

judgment without allowing the plaintiff an "adequate opportunity to respond to new evidence" presented with a reply brief).

Second, because direct evidence of discrimination exists in this case, the honest belief rule is not applicable. The Sixth Circuit "has adopted the honest belief rule at the pretext stage of the evaluation of discrimination claims." *Murphy v. Ohio State Univ.*, 549 F. App'x 315, 322 (6th Cir. 2013). *See also A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 705 (6th Cir. 2013) ("The 'honest belief' rule, as it is called, comes in at the pretext stage"). However, in cases involving direct evidence of discrimination – where pretext analysis is irrelevant – the honest belief rule simply does not apply. *See, e.g., Evangelista v. Auto-Wares, LLC*, 2016 WL 1407838, at *4 (E.D. Mich. Apr. 11, 2016) (honest belief rule inapplicable because no pretext stage analysis required); *EEOC v. Rock-Tenn Co.*, 2016 WL 6127844, at *7 (W.D. Mich. Feb. 3, 2016) (where direct evidence of discrimination exists, the honest belief rule does not apply). This rule makes perfect sense. How can it be said that a decision-maker was motivated by an honestly held, non-discriminatory reason when proof exists that the decision-maker was actually motivated by an unlawful discriminatory reason? In this case, Bledsoe presented direct evidence of Dahlman's disability and age bias, as well as Dahlman's retaliatory animus. Thus, the honest belief rule does not apply.

43

Third, the honest belief rule only applies when a plaintiff is proceeding **solely** on the basis that the proffered reason has no basis in fact – the first pretext method. If a plaintiff argues that the proffered reasons did not actually motivate, or was insufficient to motivate, the adverse action – the second and third pretext methods – then the honest belief rule has no application. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 425 (6th Cir. 2021) ("However, Nissan cannot enjoy the protection of the 'honest belief' rule if Wyatt demonstrates pretext by showing that even if Davis held concerns about her performance, those concerns did not actually motivate Davis to issue the negative performance evaluations."); *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 890 n.5 (6th Cir. 2020) ("But the 'honest belief' rule only applies as a defense to a lack of a factual basis for the legitimate nondiscriminatory reason proffered by the employer."); *Amos v. McNairy Cty.*, 622 F. App'x 529, 541 n.10 (6th Cir. 2015) ("We do not reach the issue of whether the "honest belief" rule is applicable because that defense responds more logically to the 'had no basis in fact' theory of pretext. . . . Moreover, as we discuss, evidence that demonstrates a stated reason did not actually motivate an employer to take an adverse employment action against the employee usually will also suggest that the employer did not have an honest belief in the asserted reason."); *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 795 n.5 (6th Cir. 2006) ("The honest belief rule would not prevent Plaintiff from establishing pretext through methods

other than the falsity of the reason offered.").  In this case, Bledsoe only utilized
the second and third pretext methods – that the proffered reason did not actually
motivate the challenged decision or was insufficient to warrant the challenged
decision.  (Resp., RE 33, Page ID # 813-23.)  He did not dispute that federal ethics
rules prevented him from teaching his son.

Fourth, the honest belief rule does not apply in the context of cat's paw
liability.   "In a cat's paw case, the allegation is that a biased subordinate
intentionally manipulated the decisionmaker.  Under these circumstances, the
decisionmaker's intent does not matter, and consequently the honesty of the
decisionmaker's belief does not matter."  *Marshall v. The Rawlings Co. LLC*, 854
F.3d 368, 380 (6th Cir. 2017) (rejecting application of honest belief rule in FMLA
retaliation case where cat's paw theory is applied).  *See also Wyatt v. Nissan N.
Am., Inc.*, 999 F.3d 400, 422 (6th Cir. 2021) ("[T]he ultimate decisionmaker['s] []
'good faith' belief . . . is irrelevant when an employee proceeds under a cat's paw
theory of liability."); *Pierce v. Gen. Motors LLC*, 716 F. App'x 515, 518 (6th Cir.
2017) (recognizing that the honest belief rule does not apply to cat's paw theory of
liability).  In this case, Bledsoe argued that the cat's paw theory of liability could
apply since Dahlman and Bailey alone could not demote Bledsoe.  (Resp., RE 33,
Page ID # 816-17.)  Only the LJTS could demote and remove Bledsoe from his
instructor position.  Under the cat's paw theory, Bledsoe contends that Dahlman

45

and Bailey collectively influenced the LJTS to demote Bledsoe.  Markum admitted that she "relied heavily" on the opinions of Dahlman and Bailey when considering whether to demote Bledsoe.  (Markum depo. p. 42, RE 30-11, Page ID # 625.) Dahlman and Bailey convinced Markum not to pose any further ethics questions to TVA's ethics department, including whether transferring Plaintiff to NLOR instructor would cure the ethics issue.  (Id. at 42-43, 45-46, RE 30-11, Page ID # 625-626.)  Because the cat's paw theory applied to this case, the district court should not have applied the honest belief rule.

Finally, assuming *arguendo* that the honest belief rule does apply, it does not shield TVA from liability in this case.  "An employer's invocation of the honest belief rule does not automatically shield it" from liability.  *Seeger v. Cincinnati Bell Tel. Co., LLC,* 681 F.3d 274, 286 (6th Cir. 2012).  The honest belief rule can be rebutted by evidence that the employer failed to make a reasonably informed decision. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006).

Bledsoe produced sufficient evidence to question whether the LJTS' decision to demote Bledsoe was "reasonably informed."  First, the LJTS never had – nor did it bother to seek – an ethics opinion regarding the transfer of Bledsoe to NLOR, which it easily could have done.  (Markum depo. pp. 44-45, RE 30-11, Page ID # 625-626.)  Second, the LJTS members were aware that the NSGPO exams could be password protected, thus providing enhanced security and

eliminating any appearance of impropriety. (Dahlman depo. pp. 93-94, RE 30-1, Page ID # 263; Michael depo. pp. 65-66, RE 30-16, Page ID # 695; Smith decl. ¶9, RE 33-3, Page ID # 829; Allen decl. ¶8, RE 33-2, Page ID # 826.) Third, the argument that NLOR instructors might be needed to teach NSGPO classes was purely a sham. In both the past, and during the entire 18-month NSGO class that began in March 2018, NLOR instructors were never used to teach NSGPO classes. (Smith decl. ¶10, RE 33-3, Page ID # 829-830; Williams depo. pp. 35-36, RE 30-5, Page ID # 496-497; Allen decl. ¶8, RE 33-2, Page ID # 826.) Finally, the fact that Michael and Dahlman knowingly allowed Bledsoe to continue working in both the NSGPO and NLOR program long after receiving the ethics opinion greatly undercuts their "appearance of impropriety" argument. It is undisputed that Bledsoe continued functioning as an NSGPO instructor through January or February 2018, finalizing lesson plans and exams, updating his instructor qualifications, and helping with the NLOR program. (Bledsoe depo. pp. 136, 146, 154, RE 30-6, Page ID # 573, 576, 578; Michael depo. pp. 83-84, RE 30-16, Page ID # 700.) Dahlman and Michael could not have "honestly believed" that it was "unethical" for Bledsoe to transfer to NLOR while knowingly allowing him to continue working in both the NSGPO and NLOR programs for **two whole months after** receiving the ethics opinion.

47

**IV.    The District Court Incorrectly Dismissed Bledsoe's Retaliation Claims**

The district court erred in concluding that Bledsoe failed to show a causal connection between his protected activity and demotion.  (Memo. Opin., RE 51, Page ID # 949.)  Bledsoe produced sufficient evidence to create a genuine issue of material fact as to whether retaliatory animus was the "but-for" cause for the LJTS' decision to demote Bledsoe.

A *prima facie* case of retaliation under the Rehabilitation Act and the ADEA requires four elements: (1) plaintiff engaged in protected activity; (2) defendant knew about the protected activity; (3) defendant subsequently took an adverse employment action; and (4) a causal connection existed between the protected activity and the adverse employment action.  *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (Rehabilitation Act); *Braithwaite v. Dep't of Homeland Sec.*, 473 F. App'x 405, 413 (6th Cir. 2012) (ADEA).   Bledsoe easily meets this standard.  First, Bledsoe engaged in protected activity when he complained of disability and age discrimination to Markum on or about November 27, 2017. (Bledsoe depo. pp. 158-59, 163, RE 30-6, Page ID # 579-580.)  The key LJTS members – Dahlman, Michael, Markum, and Williams – were aware of Bledsoe's protected activity.  Markum and Williams were present when Bledsoe complained. (Id. at p. 163, RE 30-6, Page ID # 580.)   Shortly thereafter, Bailey informed Bledsoe that he had shared Bledsoe's complaints with Dahlman.  (Id. at 38-39,

168-69, RE 30-6, Page ID # 549, 581.)   Michael also admitted being aware of Bledsoe's protected activity.  (Michael depo. p. 87, RE 30-16, Page ID # 701.)

Causal connection can be proven by both temporal proximity and Dahlman's retaliatory statements.  Close temporal proximity between the protected activity and adverse employment action may satisfy the causation element of a *prima facie* retaliation claim.  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  Three months is sufficiently close temporal proximity to establish the causation element of a *prima facie* retaliation claim.  *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004).  When Bailey informed Bledsoe that he had shared Bledsoe's complaints with Dahlman, he stated that Dahlman was "pissed."  (Bledsoe depo. pp. 38-39, 168-69, RE 30-6, Page ID # 549, 581.) Furthermore, in December 2017, Bailey informed Bledsoe that he had been talking with Dahlman and based on that conversation, Bailey stated, "I'm afraid Chris [Dalhman] is going to try to get you out of here because he's really pissed off about you going and talking to HR."  (Id. at 169, RE 30-6, Page ID # 581.) Additionally, Dahlman had warned Bledsoe on several occasions that he was vindictive and that Bledsoe should never "piss [him] off."  (Id. at 25, 26, 31, 39, RE 30-6, Page ID # 545-547, 549.)

Viewing these facts in a light most favorable to Bledsoe, a jury could believe that Dahlman's retaliatory animus against Bledsoe motivated his influence upon

the LJTS members to demote Bledsoe.  The same pretext evidence that supports Bledsoe's disability and age discrimination claims also supports Bledsoe's retaliation claims.

## V.  The "Solely By Reason of Disability" Standard Does Not Apply to Bledsoe's Rehabilitation Act Claim.

The district court erred in concluding that Bledsoe had to prove that his demotion was "solely because of [his] disability."  (Memo. Opin., RE 51, fn. 3, Page ID # 943; RE 51, Page ID # 946.)  The causation language quoted by the district court applies to Rehabilitation Act claims brought under 29 U.S.C. § 794.  In this case, Bledsoe's Rehabilitation Act claims are asserted under 29 U.S.C. § 791.  (Compl. ¶30-32, RE 1; Page ID # 7-8.)  Claims brought under 29 U.S.C. § 791 apply the same standards that apply to Title I of the ADA.  29 U.S.C. § 791(f).  The causation standard for claims brought under Title I of the ADA is "but-for" causation.  *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012).

The Rehabilitation Act provides two separate provisions under which a person may bring a discrimination claim – Section 501 and Section 504.  Gardner, Jessica, *Reconciling Rehabilitation Act Claims*, 8 LMU Law Rev. 110, 111 (2021).  Section 501 is codified at 29 U.S.C. § 791, and Section 504 is codified at 29 U.S.C. § 794.  "Section 501 is aimed at preventing agencies of the federal government from discriminating against applicants and employees with disabilities, whereas

Section 504 applies to programs conducted by *private* entities receiving federal financial assistance in addition to programs conducted by executive agencies." 8 LMU Law Rev. at 111 (emphasis in original). "The standards of causation differ depending on the selected section for filing a federal employee disability discrimination claim – section 501 only requires a 'but for' causation standard while section 504 requires a 'sole' causation standard." *Id*. at 136.

In *Pinkerton v. Spellings*, 529 F.3d 513 (5th Cir. 2008), the Fifth Circuit addressed whether the sole-cause standard found in Section 504 of the Rehabilitation Act should apply to a claim brought under Section 501 of the Rehabilitation Act. It held that the sole cause standard only applied to claims brought under Section 504, but not to claims brought under Section 501. In so holding, the Fifth Circuit first reasoned that "Congress's inclusion of § 501(g),[1] which explicitly incorporates the use of ADA standards 'to determine whether this section has been violated' (29 U.S.C. § 791(g)), means that, under a plain reading of the statute, the ADA causation standard incorporated by § 501(g) governs claims brought under § 501." *Pinkerton*, 529 F.3d at 516–17. Simple statutory construction leads to this logical conclusion. The word "solely" does not appear in Section 501. Because Section 501(g) adopts the ADA causation standard, it would

---

[1] The Rehabilitation Act Amendments of 1992, Pub. L. No. 102-569, added subsection (g) to Section 501, which adopts the causation standard for claims under Title I of the ADA. In 2014, subsection (g) was redesignated as subsection (f) in the Workforce Innovation and Opportunity Act, Pub. L. No. 113-128.

be absurd to ignore such plain instruction and import the sole-cause standard from Section 504. Second, the Fifth Circuit noted that because the Rehabilitation Act was amended to make it more consistent with the ADA's protections, it logically dictates that the identical causation standard that applies to ADA claimants should apply to federal employees. *Id*. at 517. Finally, the Fifth Circuit noted that "[a]pplying different causation standards to claims brought under § 501 and § 504 is consistent with how Congress distinguishes between § 501 and § 504 in the statutory scheme," particularly with different remedies and procedures available under the two sections. *Id*. Section 501 cites to the remedies provision of Title VII of the Civil Rights Act of 1964, while Section 504 cites to the remedies provision of Title VI of the Civil Rights Act. *See* 29 U.S.C. § 794a(1)-(2).

No other circuit court has squarely addressed this issue. Many district courts outside the Fifth Circuit have reached the same conclusion of *Pinkerton* – that the sole causation standard does not apply to Section 501 claims. *See, e.g., Matthews v. McDonald*, 2016 WL 29622, at *11 (S.D. Cal. Jan. 4, 2016); *Maish v. Napolitano*, 2013 WL 5770345, at *4 (W.D. Wash. Oct. 24, 2013); *Katz v. Geithner*, 2013 WL 815999 (D. Haw. 2013); *Ward v. Vilsak*, 2011 WL 6026124 (E.D. Cal. 2011); *Carroll v. Holder*, 2011 WL 7091804 (D. Or. 2011); *Womanchild v. Nicholson*, 2008 WL 714091 (W.D. Wash. 2008); *Thomas v. Department of Veterans Affairs*, 2006 WL 1636738, at *13 fn.6 (S.D.N.Y. 2006);

*Stewart v. U.S.*, 2000 WL 1705657 at *4, fn.10 (N.D. Cal. 2000); *Biddle v. Ruben*, 1995 WL 382961 (N.D. Ill. June 23, 1995).

The Sixth Circuit has never specifically addressed the issue. At times, the Sixth Circuit has stated – without explanation – that the sole-cause standard applies to federal employee claims brought under the Rehabilitation Act. *See, e.g., Mitchell v. U.S. Postal Serv.*, F. App'x 838, 843 (6th Cir. 2018); *Jones v. Potter*, 488 F.3d 397, 409-10 (6th Cir. 2007). This apparent contrary precedent is often the result of the plaintiff's failure to specify under which section of the Rehabilitation Act the plaintiff is proceeding, and the court's failure to consider the different statutory language in the two sections. For example, in *Jones v. Potter*, when the Sixth Circuit noted that the sole-cause standard applied, it cited to a Section 504 [§ 794] claim. *Jones v. Potter*, 488 F.3d 397, 409–10 (6th Cir. 2007) ("But that is not enough under the Rehabilitation Act, which, unlike Title VII, requires Jones to prove that he was fired "*solely* by reason of ... his disability." *See Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 (6th Cir. 1995) (quoting 29 U.S.C. § 794(a)) (emphasis added)). Thus, Sixth Circuit cases such as *Jones* or other cases brought under Section 504 are neither dispositive nor particularly informative on this issue.

Simple statutory construction, in addition to caselaw like Pinkerton that have addressed this issue, dictate that the appropriate causation standard for a Section

501 claim is "but-for" causation – the same standard that applies to ADA claims in the Sixth Circuit. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012). The sole-cause standard applicable to Section 504 claims should not be imported to Bledsoe's Section 501 claim in this case.

# CONCLUSION

For the reasons discussed above, Mr. Bledsoe respectfully requests that the Court reverse the judgment of the district court granting TVA's motion for summary judgment and remand this case for trial on all claims.

Respectfully submitted,

/s/Doug S. Hamill
Doug S. Hamill (BPR No. 022825)
620 Lindsay Street, Suite 200
Chattanooga, Tennessee 37403
(423) 541-5400

Counsel for Appellant Robert Bledsoe

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,783 words according to Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

s/Doug S. Hamill
Doug S. Hamill

## CERTIFICATE OF SERVICE

I certify that I electronically filed and served this Brief of Appellant Robert Bledsoe using the Court's CM/ECF system upon Kathleen K. Griebel, Esq., Lamont A. Belk, Esq., David D. Ayliffe, Esq., and Courteney M. Barnes-Anderson, Esq. on September 14, 2021.


s/Doug S. Hamill
Doug S. Hamill

# ADDENDUM

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry No. | Description of Document | Page ID # |
|---|---|---|
| 1 | Complaint | 1-10 |
| 8 | TVA's Motion to Dismiss | 37-39 |
| 11 | Response in Opposition to TVA's Motion to Dismiss | 78-96 |
| 18 | Memorandum Opinion and Order re: Motion to Dismiss | 134-145 |
| 24 | Plaintiff's Motion for Partial Summary Judgment | 163-210 |
| 24-1 | Bledsoe's 1st Declaration | 165-166 |
| 27 | Joint Stipulation re: Disability | 229-230 |
| 30 | TVA's Motion for Summary Judgment | 235-765 |
| 30-1 | Dahlman Deposition | 239-294 |
| 30-2 | 11/21/2017 Email Chain | 295-299 |
| 30-4 | Bailey Deposition | 332-460 |
| 30-5 | Williams Deposition | 461-537 |
| 30-6 | Bledsoe Deposition | 538-605 |
| 30-11 | Markum Deposition | 614-666 |
| 30-14 | 11/20-21/2017 Email Chain | 671-673 |
| 30-16 | Michael Deposition | 677-719 |
| 30-18 | R. Hudson Bledsoe Declaration | 723-724 |
| 31 | TVA's Memorandum in Support of Mot. Sum. Judg. | 766-790 |
| 32 | TVA's Statement of Undisputed Facts | 791-798 |
| 33 | Response in Opposition to Mot. for Summary Judgment | 799-836 |
| 33-2 | Allen Declaration | 825-827 |
| 33-3 | Smith Declaration | 828-830 |
| 33-4 | Painter Declaration | 831-832 |
| 33-5 | 2/27/2018 Email | 833 |
| 33-6 | Compensation Documents | 834-835 |
| 33-7 | Williams EEO Declaration | 836 |
| 34 | Plaintiff's Response to TVA's Statement of Undisp. Facts | 837-850 |
| 35 | Plaintiff's Statement of Undisputed Facts | 851-856 |
| 36 | TVA's Reply in Further Support of Mot. for Sum. Judg. | 857-867 |
| 51 | Memorandum Opinion and Order re: Summary Judg. | 936-950 |
| 52 | Judgment | 951 |
| 53 | Notice of Appeal | 952-953 |